# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**CHRISTOPHER ALEXANDER,**<br>                    **Debtor**<br>              _____<br><br>**CHESLEY ORIEL and JUDITH CADER,**<br>                    **Plaintiffs**<br><br>**v.**<br><br>**CHRISTOPHER ALEXANDER,**<br>                    **Defendant** | **Chapter 7**<br>**Case No. 08-19342-FJB**<br><br><br><br><br>**Adversary Proceeding**<br>**No. 09-1086** |
| **In re**<br><br>**LOUISE ANGELINI,**<br>                    **Debtor**<br>              _____<br><br>**CHESLEY ORIEL and JUDITH CADER,**<br>                    **Plaintiffs**<br><br>**v.**<br><br>**LOUISE ANGELINI,**<br>                    **Defendant** | **Chapter 7**<br>**Case No. 08-19221-FJB**<br><br><br><br><br>**Adversary Proceeding**<br>**No. 09-1087** |

## <u>MEMORANDUM OF DECISION</u>

By their complaints in the above-captioned adversary proceedings, Chesley Oriel ("Oriel") and

Judith Cader ("Cader") (collectively, the "Plaintiffs") seek a determination that a judgment they hold

against the defendant chapter 7 debtors, Christopher Alexander ("Alexander") and Louise Angelini

("Angelini"), in the principal amount of $135,000 is excepted from discharge by 11 U.S.C. § 523(a)(2)(A).

Having now tried these matters and for the reasons set forth below, the Court concludes that the

judgment debt against Angelini is not excepted from discharge and that the judgment debt against

Alexander is excepted from discharge only to the extent of $10,104.06, plus interest on $8,340.00 at the state judgment rate from the date of judgment.

**PROCEDURAL HISTORY**

In 2006, the Plaintiffs entered into a construction contract with Season-All, Inc., for renovation of a home they owned in Hull, Massachusetts.  They dealt with Season-All primarily through Alexander.  He was an officer of the corporation and the person through whom the corporation entered into the contract with the Plaintiffs and oversaw the renovation of their home.  Angelini had been treasurer of the corporation.  As detailed in the findings below, the renovation project went badly.  In January 2007, the Plaintiffs filed suit in Massachusetts Superior Court against Alexander and Angelini (among others) for claims arising from the contract and renovations.  Alexander and Angelini defaulted, whereupon, in August 2007, default judgment entered against them, jointly and severally, in the total amount of $163,614.98.

Then, on December 2 and 5, 2008, first Angelini and then Alexander filed petitions for relief under chapter 7 of the Bankruptcy Code, commencing the bankruptcy cases in which these adversary proceedings arise.  In due course, each debtor received a discharge, but not before the Plaintiffs timely filed a complaint against Alexander and another against Angelini.  Each seeks a determination that the defendant debtor's debt to the Plaintiffs under the state court judgment is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt for false pretenses, false misrepresentation, or actual fraud.[1]

The Debtors, acting *pro se*—as each Debtor has done throughout these adversary proceedings— filed answers in their respective adversary proceedings, denying the operative allegations against them.

---

[1] Each complaint also includes a separate count under 11 U.S.C. § 523(a)(6) for a determination that debtor's judgment debt is excepted from discharge as one for willful and malicious injury to the Plaintiffs or their property.  On the first day of trial, however, the Plaintiffs voluntarily dismissed their counts under § 523(a)(6) and indicated that they were proceeding under § 523(a)(2)(A) alone.  Transcript, Day 1, p. 17.

Alexander also filed a counterclaim against the Plaintiffs in two counts, the first for damages under the contract and the second for orders of referral to appropriate authorities for investigation of alleged insurance fraud and violations of conservation bylaws by both Plaintiffs and attorney misconduct by Oriel. The Plaintiffs filed an answer to the counterclaim.

The two adversary proceedings were consolidated for trial and tried over four days. At the conclusion, each party submitted proposed findings of fact and conclusions of law.

Before proceeding to the findings of fact, it is important to understand the specific allegations of false representations, false pretenses, and fraud against each defendant. The complaint against Alexander alleges two sets of representations or pretenses on which the Plaintiffs are proceeding.

With respect to the first set, the complaint alleges:

> 8. [Alexander] represented that he and the Corporation were duly licensed Massachusetts home improvement contractors with the financial resources, knowledge, skill, and sufficient staff to timely and competently perform a renovation project on the Plaintiffs' property located at 64 H Street, Hull, Massachusetts (the "Renovation Project").
>
> 9. The Plaintiffs, relying to their detriment on the aforementioned representations, warranties, and assurances, entered into a contract with the Debtor and the Corporation to perform the Renovation Project.[2]

Notwithstanding these allegations, the complaint includes no allegation that the representations identified in paragraph 8 of the complaint were false; therefore, one cannot readily read paragraphs 8 and 9 of the complaint, by themselves, as specifying a basis for nondischargeability under § 523(a)(2)(A). When asked at trial to clarify the factual bases of their § 523(a)(2)(A) claims, Plaintiffs' counsel clarified the allegations in paragraphs 8 and 9 as follows: (1) they are satisfied that Alexander's representation that he and the corporation were duly licensed was not false, and therefore that representation is no longer a basis on which they are proceeding.; (2) they did not indicate that they are continuing to rely on representations that Alexander and the corporation had the knowledge, skill, and

---

[2] Alexander Complaint, ¶¶ 8-9.

staff needed to timely and competently complete the project; (3) they are relying on an alleged

representation that Alexander and the corporation had the financial resources to timely and

competently complete the project, but (i) this "representation" was made by false pretenses—that is,

conduct leading to a false impression--not verbally, (ii) the impression created was that Alexander and

the corporation were solvent, (iii) this impression was false; and (iv) the impression was created by the

Alexander's appearance and pattern of conduct, including (to the extent that these were specified at all)

that he "showed up on Harley Davidsons."[3]  The first basis of the § 523(a)(2)(A) claim against Alexander

is therefore reduced to an allegation that the judgment debt arose from false pretenses as to his and the

corporation's solvency.

       The second set of alleged representations in the Alexander complaint is in paragraph 11.  The

complaint states:

> 11. During the Renovation Project, the Plaintiffs paid a total of
> $156,670.00 to the Corporation based on [Alexander]'s representations
> that the payments were specifically for work, materials, and labor.
>
> 12. Unbeknownst to the Plaintiffs, [Alexander] failed to order all of the
> materials or make the aforementioned payments and instead cashed
> several of the Plaintiffs' checks at a check-cashing establishment
> totaling $93,481.00.
>
> 13. Both [Alexander] and Angelini used those funds for their personal
> purposes.[4]

Again, the complaint does not allege that the representations in paragraph 11—promises to use

advanced funds for particular purposes—were false, *i.e.*, that Alexander made the promises without

intent to honor them, a false representation of intent.  Rather, it merely alleges that Alexander and

Angelini used the advanced funds other than as Alexander had promised.  Neither does the complaint

indicate when, where, and how these representations were made.  When asked at trial to clarify the

---

[3] Transcript, Day 1, pp. 21-22.
[4] Alexander Complaint, ¶¶ 12-13.

factual bases of their § 523(a)(2)(A) claims, Plaintiffs' counsel clarified the allegations in paragraphs 11-13 as follows:

> [Alexander] represented that he would use their money to purchase materials for their projects and do the work as set forth in the contract. That didn't happen. There were materials that he represented had been purchased, but they hadn't been.[5]

The Alexander complaint includes no other allegations of fraud, misrepresentation, or false pretenses by Alexander.  Nor did the Plaintiffs, in their complaint or in counsel's clarifications before trial, specify when, where, and how Alexander made the representations in question.  The alleged misrepresentations were not pled with particularity.

The Angelini complaint makes no separate allegation of fraud, false representation, or false pretenses against her except to state that "[she], both individually and as an officer of the Corporation [Season-All], aided and abetted Alexander in his fraudulent activities."[6]  At trial, the Plaintiffs clarified that they were not proceeding against Angelini for false pretenses or false representations but only for "actual fraud" as defined in *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).[7]  Plaintiffs' counsel indicated that the evidence of actual fraud would consist of proof that Angelini  (i) was treasurer and a 51 percent shareholder of the corporation, (ii) handled "the money,"[8] (iii) benefited from Alexander's defrauding of the Plaintiffs, and (iv) knew what was going on.


**FINDINGS OF FACT**[9]

     1.      Season-All, Inc. was a Massachusetts corporation, incorporated in 2003.  At all relevant times, Angelini owned 51 percent of its stock, Alexander the other 49.  At all relevant times, Alexander

---

[5] Transcript, Day 1, pp. 22.
[6] Angelini  Complaint, ¶ 14.
[7] Transcript, Day 1, pp. 18-19.
[8] Counsel did not specify *what* money.
[9] The findings of fact are limited to the facts relevant to the counts against Alexander and Angelini arising from the second set of alleged misrepresentations:  those concerning the uses to which payments had been or would be put.  For reasons set forth in the conclusions of law, the other counts in this adversary proceeding may be dismissed on grounds other than factual findings.

was its president, secretary, and sole director; until September 2005, Angelini was its treasurer.   The

business of Season-All was construction contracting.  Alexander handled the construction aspects of the

business and was licensed as a construction supervisor.  Angelini's activity in the business, while she had

an active role, was to keep the books and pay the bills.  She also personally guaranteed a number of

Season-All's accounts, and her credit standing was instrumental in the corporation's business strategy.

2.      Season-All was headquartered in the basement of Alexander's and Angelini's home and

occupied the entirety of their basement and of their garage.  As part of Season-All's overhead, it

compensated Oriel and Angelini for its use of their space and utilities by paying a portion of their

mortgage and utility payments.  The frequency and amounts of these payments are not in evidence.

3.      Angelini and Alexander lived together and had two children with each other.   The

second was born in or around March, 2006, shortly before the beginning of dealings between Alexander

and the Plaintiffs.  Angelini's pregnancy with the second child was difficult and caused her to cease

working for Season-All in September, 2005.  At this point, she ceased to have any role in Season-All, and

Alexander took over the duties she previously had handled; it is not clear that her status as treasurer of

the corporation was ever formally terminated, but it is clear that she ceased to actually do work for the

corporation and to be involved in its management and operations.  In the first months of his life, the

second child had severe and life-threatening health issues that necessitated surgery, extensive

hospitalization, and, into September 2006, the complete and constant care and attention of his mother.

During this time, including all times relevant to the contract between Season-All and the Plaintiffs, she

had no role in the day-to-day operation of the business[10] and no involvement with the Plaintiffs'

---

[10] The Plaintiffs request a finding that between March and September 2006, Angelini signed checks on behalf of
Season-All.  The evidence that the Plaintiffs cite in support, Plaintiffs' Exhibit 12, consists of the records of a
personal account, not of a Season-All account.  These records are not evidence that Angelini signed checks for
Season-All.  The records of Season-All's own checking account show that Season-All's checks for this period were,
in all but two instances, signed by Alexander.  The two exceptions are checks to Eastern Bank, both signed by
"Louise Angelini, Authorized Representative," but the signature in each instance is typographic, not handwritten.
No testimony was elicited about these checks, which on their face are quite different from the other checks
written on this account.  In any event, I am satisfied that even if Angelini is responsible for these two checks, they

contract.  There is no evidence that Alexander kept her informed of developments on that front.  She did

not become aware of troubles on this project until early August 2006 (the precise date is not in

evidence).

4.       In the early months of 2006, Season-All and Alexander, as a person responsible for its

tax withholding, owed federal and state taxes, consisting of taxes that Season-All had been required to

withhold.  The federal tax debt was approximately $10,000 at the time; the amount of the state tax debt

is unclear.  Alexander was deemed a responsible person for the corporate taxes and therefore was

personally liable for the corporation's tax debt; the taxing authorities did not deem Angelini to be a

responsible person.  Neither Season-All nor Alexander had the resources at the time to pay this debt.  In

2007, Alexander entered into an agreement with the IRS to pay the federal debt in installments.

5.       Alexander feared that, to collect these arrears, the taxing authorities would levy on

Season-All's bank account and on Alexander's individual bank account.  Consequently, when Season-All

received payments, Alexander determined that he could not simply channel those payments through

Season-All's bank account, which he feared would be tantamount to paying the funds over to the IRS.

This would effectively have shut down Season-All's business.  To use the funds for other purposes, such

as purchasing materials and paying subcontractors, he needed to find another means of cashing and

processing the monies being paid to Season-All.  For a time, starting around the time Season-All entered

into its contract with the Plaintiffs, he solved this problem by cashing the payments at a check cashing

facility.  This was expensive, costing Season-All three percent of the face value of each check, which cut

into Season-All's profit margin; but it kept the money flowing and allowed Season-All to continue

servicing the Plaintiffs' contract.

6.       Later, after Alexander was able to start depositing checks into a bank account again, he

continued to use the check cashing facility on occasion when it was imperative that monies received by

were the exception and not the rule and do not show general involvement by her in the business or the Plaintiff's
project.

Season-All be immediately available for payment of the corporation's obligations.  The bank would subject funds deposited by check to a five-day hold, and, because cash was tight, Season-All would sometimes have immediate need of the deposited cash to meet payroll or other obligations.

7.      Season-All was a subchapter S corporation.  Alexander received no regular salary from the corporation but took his compensation from the corporation in the form of occasional draws.  In view of the fear of levy on his personal bank account, he sometimes paid these draws directly to Angelini for her use in paying the expenses of their household.  During the time of the dealings between the Plaintiffs and Season-All, Alexander was the sole earner in the household.  Although Angelini was herself a part owner of Season-All, she received no draws of her own.  Their household income consisted of Alexander's draws from Season-All and the monies Season-All paid them for the use of their basement and garage.

8.      On April 1, 2006, the Plaintiffs entered into two written construction agreements (the "CAs") with Season-All by which they hired Season-All to handle the renovation of a coastal home for them in Hull, Massachusetts for a total price of $145,000.  The Plaintiffs dealt with Season-All entirely through Alexander, who negotiated the construction contracts on behalf of Season-All.

9.      The parties' first CA ("CA1") was for $32,000, on which work was to begin no later than April 10, 2006.  Their second ("CA2") was for an additional $113,000, on which work was to begin no later than May 1, 2006.  Both required that the work be completed by July 15, 2006.  The parties divided their agreement into two parts for at least two reasons:  first, to make it possible for work to begin on schedule on part of the project while they obtained regulatory permission that would be necessary for other parts; and second, to finesse certain regulations, which the parties have referred to as the "FEMA" by-laws and guidelines governing construction in coastal areas, which I will refer to collectively as the FEMA Regulations.

10.     The details of the FEMA Regulations remain very unclear, but they clearly played a major role in structuring the CAs and in delaying the progress of work on them.  As related to me by the parties, the FEMA Regulations mandated that if the cost of work on the Plaintiffs' home exceeded 50% of the value of the existing structure (just the structure, not the land surrounding it), then the project would have to be redesigned, at prohibitive expense, to bring the existing structure into compliance with code requirements for buildings in a flood zone.  It was very important to the Plaintiffs that they avoid this consequence.  They were aware that, in view of the combined cost of the CAs and the value of the structure, a question would arise as to whether this project exceeded the 50% threshold and would be permitted to proceed as planned.  When the parties entered into the CAs, the Plaintiffs' initial permit application had been rejected.  Their overall agreement was structured as two CAs to permit certain work on the existing structure—including at least the replacement of roof, windows, and siding, which became the sum and substance of CA2—to proceed while an appraisal was obtained and a permit secured for the rest of the project.  For what it was worth, this had the added benefit of presenting the permitting authority, the Building Commissioner for the Town of Hull, with two smaller contracts instead of one larger one.  A permit was issued for work to proceed on CA2 while a permit was still being sought on CA1.

11.     Each CA identified both Chesley Oriel and Judith Cader as a party to the CA, but only Oriel signed the CAs.  Cader signed neither.  Notwithstanding that she never signed the CAs, the parties agree that she was a party to both.

12.     Both CAs required Season-All to complete certain work that was specified by reference to architectural plans that were neither attached to the agreements nor introduced into evidence.  Though neither party introduced anything like a comprehensive list of the work to be performed, the trial record indicates that the renovations that Season-All was hired to complete included, among other things, (i) construction of a 500 sq. ft. addition to the home; (ii) construction of two decks, one front and

9

one rear; (iii) replacement of the windows, roof, and siding on the existing structure; (iv) relocation of the stairway to the basement; (v) renovation of a bathroom; (v) installation of a counter, cabinets, and new floor in the kitchen; (vi) renovation of a basement bathroom and basement bedroom; (vii) insulation of the existing structure for year-round use; and (viii) installation of central air conditioning. CA1 covered the addition and the interior remodeling of the existing structure; CA2 covered the replacement of windows, siding, and roof on the existing structure.

13.     Neither CA included language by which Season-All promised, or became obligated, to use the Plaintiffs' payments for specific purposes.  Nor did they indicate in any way that monies paid by the Plaintiffs to Season-All remained the Plaintiffs' after payment.  Nonetheless, the parties stipulated at trial that the Plaintiffs' payments "were to be used for work, materials, and labor."  The parties' stipulation of facts, which was read into evidence on the second day of trial, does not elaborate on this statement.  Notably, it does not specify how or when this obligation—to use the payments for work, materials, and labor—arose.  Nor does the stipulation of facts explain what it means to use a payment "for work" as opposed to "for materials [and] labor."  In any event, the Plaintiffs clearly understood that the monies they were obligated to pay under the contract were doing more than compensating Season-All for the labor, materials, and subcontract work it would need to procure to get their project completed, the "hard costs."  They understood that the contract price was designed also to do at least two further things:  to cover Season-All's overhead, which Alexander sometimes referred to as "soft costs" or the corporation's "burden" and which were built into the contract in an amount equal to 26 percent of the hard costs; and to pay Season-All a profit on the job.  Alexander said that the CAs were priced to yield a profit equal to 8 percent of total hard costs.

14.     Regarding the timing of payments, each CA contained the following language:

Payment Schedule:  The owner shall make progress payments to the Contractor based on the cost of the work as defined, plus the Contractor's fee which is to be determined

as follows:  Step Payment Invoicing.[11]  The cost of work is defined as the cost of work incurred by the Contractor Performing the work under this agreement and shall include:

1. Wages of construction workers directly used in performing the work of this project.
2. Costs of materials used in project.
3. Payments of subcontractors who perform work on the project.
4. Costs of all materials, equipment and temporary facilities which are fully consumed in performing the work under this agreement.
5. Reasonable rental costs of temporary facilities, machinery and equipment subject to prior approval by the Owners.
6. Those portions of insurance premiums for insurance and bonds that is [sic] applicable to the work performed under this agreement.
7. Other costs incurred in performing the work of this agreement if approved in writing in advance by the Owners.

15.    Immediately after the above language, CA1 stated:

| | | |
|---|---|---|
| $10,000 due upon contract acceptance | Paid_____ | Date_____ |
| $10,000 due upon prep completion | Paid_____ | Date_____ |
| $10,000 due upon window completion | Paid_____ | Date_____ |
| $3,000 due upon work completion[12] | Paid_____ | Date_____ |

16.    Immediately after the above language in paragraph 11, CA2 stated:

| | | |
|---|---|---|
| $25,000 due upon contract acceptance | Paid_____ | Date_____ |
| $25,000 due upon frame completion | Paid_____ | Date_____ |
| $25,000 due upon deck completion | Paid_____ | Date_____ |
| $25,000 due upon Rough Inspection and upon verification of proof that contractors have been paid in full | Paid_____ | Date_____ |
| $10,000 due upon Final Inspection | Paid_____ | Date_____ |
| $3,000 due upon Cert. of Occupancy, due upon thirty (30) days after Certificate of Occupancy | Paid_____ | Date_____ |

17.    Each CA then included a multi-page schedule, entitled "Scope of Work / Cost Estimate," which provided (albeit cryptically) estimates of the total costs, by category, of labor and materials that would be used in completing the CA.  After this schedule, CA1 included only one further page, that being the signature page.  After this schedule and before its own

---

[11] Nowhere in the CAs or elsewhere in the record is the term "Step Payment Invoicing" defined or explained.

[12] This CA provided for payments totaling $33,000, but the attached schedule showed total cost of only $32,000. The last payment on the schedule of payments was in error; the last payment should have been for $2,000 instead of $3,000.

signature page, CA2 contained five pages of terms, which pages and terms do not appear in

CA1.  The terms appearing in CA2 include the following:

> Application for Payment:
> a)  Unless stipulated in the Construction Agreement, provide for a detailed breakdown of the agreed Contract Sum showing value allocated to each of the various parts of the Work, as specified herein and in other provisions of the Contract Document to facilitate evaluation of the Application for Payment.
> b)  Prior to the first application for payment, submit a proposed schedule of values to the Owner.
> c)  When so required by the owner, provide copies of the subcontracts or other data acceptable to the Owner substantiating the sums described.
>
> Payments:  Payments will be made by the Owner to the Contractor in accordance with the payment schedule stipulated in the Agreement.  Payments may be withheld because of the following conditions.
> > a)  Defective work not completed.
> > b)  Failure of the Contractor to make payments to subcontractors or for materials, labor, equipment or services.
> > c)  Continued failure to perform the work in accordance with the terms and conditions set forth in this Agreement.
> > d)  Legal or other claims by third parties relating to the work performed under the Agreement.
> > e)  Final payment shall become due when the Work of the Agreement is completed in accordance with the Construction Documents.

18.     Between April 1, 2006, and September 8, 2006, the Plaintiffs made sixteen payments to

Season-All.  These totaled $156,670.00.  Alexander cashed eleven of these at a check cashing facility and

deposited five others into a bank account.  The dates and amounts of the checks, with indications of

which were cashed and which deposited, are as follows:

| Date | Cashed | Deposited |
|------|--------|-----------|
| 4/1 | $10,000.00 | |
| 4/3 | 25,000.00 | |
| 4/28 | 10,000.00 | |
| 4/28 | 2,500.00 | |
| 4/28 | 3,275.00 | |
| 4/28 | 4,000.00 | |
| 5/26 | | $35,000.00 |
| 6/19 | | 989.00 |
| 6/19 | | 6,000.00 |
| 6/19 | 10,000.00 | |
| 6/19 | | 1,200.00 |

| | | |
|---|---|---|
| 6/30 | 10,000.00 | |
| 7/6 | | 20,000.00 |
| 7/10 | 4,666.00 | |
| 8/8 | 8,340.00 | |
| 9/8 | 5,700.00 | |
| **Totals:** | **$93,481.00** | **$63,189.00** |

19.    Most of these payments were payments on the contract, but not all.  The August 8

payment of $8,340 was made for kitchen cabinets, an item that was not covered by the CAs.  It was the

Plaintiffs' obligation to fund the purchase of this item.  It is not clear whether the itemized payments

included other amounts "not on the contract."  Alexander testified to having received another payment

in the amount of $14,000 for plumbing services—for gas and water main upgrades—provided by a Mr.

Selig.  These services were not part of the CAs.  It is unclear whether the payment was made to

Alexander personally or to Season-All, but it is clear that the recipient served only as a conduit for the

payments and did in fact pay the monies received from the Plaintiffs over to Selig.  It is not clear

whether this $14,000 payment from the Plaintiffs for Selig's services is among the payments itemized in

the previous paragraph.  In any event, payments *on the contracts* did not exceed $148,330 [$156,670

minus $8,340].

20.    The total of payments exceeds the amounts specified in the contracts because of agreed

changes and because, in some instances, the Plaintiffs finally settled on fixtures or cabinets that were

more expensive than the contractual allowance for that item.  The Plaintiffs were obligated to fund the

difference between the allowance for an item and the cost of the item.  In total, there were some

$33,000 in change orders, all agreed upon between April and June, which brought the total contract

price to approximately $178,000.  Alexander testified to $176,620.  The Plaintiffs terminated the

contract before the project was completed and before payments to Season-All were completed.

21.    Work on CA2 began on schedule and proceeded apace for the first few weeks.  During

this time, Season-All worked on the existing structure by removing and replacing the roof, windows, and

siding and doing some minor demolition work.  Season-All ordered and supplied to the project the

windows, siding, and roofing materials that were needed for this work.  The work on CA2 was completed in early May.

22.     On May 2, when the old roof had been removed but before the new was installed, a rain storm blew off some or all of a tarpaulin with which Season-All had covered the house and caused rain to come pouring in.  As a result, water seeped into the ceilings and down the walls, into wallboard and insulation, and created a danger of mold.  To abate this danger, Alexander promptly stripped the wall board from the walls and ceilings throughout the existing structure.  Much of this stripping would have been necessary anyway for certain parts of the project—for example, to insulate above the ceilings, to move the stairs, to remodel the basement—but not all, and the evidence does not permit a determination of even roughly how much.  Probably it also reduced the cost of later electrical work in the existing structure.  It is unclear whether the rain damage increased the cost of the project to Season-All.  The Plaintiffs made a claim under their insurance policy for rain damage and, after the claim was initially denied, settled with the insurer for a $50,000 payment.

23.     Approval for the CA1 phase of the project was ultimately obtained, but only in early June.  By virtue of this delay in permitting, and through no fault of Alexander or Season-All, the project lay largely dormant for most of a month.  During this period, to make profitable use of time that would otherwise have been wasted, Season-All began work on at least one other project for another customer.

24.     Once the permit was obtained, construction began on the CA1 phase.  Season-All built the addition, installed the plumbing and the HVAC systems, made significant progress on the decks, framed the new rooms in the basement, moved the stairway to the basement from the front of the house to the back, and installed two skylights, a basement shower stall, several doors, and a garage door and opener.

25.     The project was further delayed and burdened by several additional issues.  First, the Plaintiffs insisted on a change in the plans for one of the decks—a minor change but nonetheless one

that required further surveying of the property and work with the Conservation Board, during which work on the deck could not proceed further.  Second, the Plaintiffs were unable to make decisions about design of the kitchen, decisions that were necessary for work on that front to proceed.  Third, and perhaps most critically, after plans had been sent to the building commissioner for permitting purposes, the Plaintiffs insisted on further changes that materially altered the project.  The result was that the Plaintiffs wanted Alexander to proceed with the project in a manner that had not been permitted, especially concerning the installation of electrical work through the basement.  Mr. Oriel wanted Alexander to proceed, counseling that "In this town it's better to beg for forgiveness than to ask for permission."  Alexander was understandably reluctant to proceed, fearing that, if the building inspector felt deceived or unwilling to forgive, Season-All might be left bearing the cost of undoing and correcting the work.  Alexander also feared the consequences for his own license.  Fourth, though the CA1 phase of the project was permitted to proceed, the permission was based on a contract price that Alexander knew to be artificially very low, and even more so after later change orders increased the cost of the contract.  This too caused Alexander concern about possible repercussions of proceeding.

26.     On July 5, 2006, Oriel sent Alexander an email, followed by discussions and negotiations the next day, the outcome of which was a hand-written agreement, dated July 6, that Alexander reluctantly signed.  It specified items that Season-All was required to complete by certain deadlines, the latest being July 24, as a condition of the next payment, which would in any event be limited to $10,000.  Alexander viewed this as a unilateral move by Oriel to modify the contract, to which Oriel obtained his assent only by threat of withholding payment.  Money was tight at Season-All, and Oriel's withholding of payments that Alexander believed to be due and payable had a material effect on Season-All's ability to continue the project.  Alexander later called this July 6 agreement the beginning of the end of Season-All's relationship with the Plaintiffs, a process that would take another few months to play out.

27.     After this date, progress on the project slowed, and it is unclear what further work was

performed.  There is no detailed account in the record of what transpired on the project during this

period.  On October 5, 2006, Season-All hired legal counsel and, through counsel, sent Oriel a letter

informing him that Season-All had stopped work on the Plaintiffs' project "based on substantial issues

that have arisen concerning compliance of additional requested work with the Massachusetts State

Building Code and concerning payment for work and materials provided to date.  Season-All will do no

further work on the project until these issues have been resolved."  At some point within the next

month, the Plaintiffs responded by notifying Season-All and the Building Commissioner that Season-All

and Alexander were terminated as the builder for their renovation project.

28.     Alexander testified that Season-All paid to third-parties approximately $106,000 for

labor, materials, and subcontracts for the Plaintiffs' project.  Except as to $855 that Alexander had

represented was paid for installation of a garage door and which he later conceded was included in this

total in error, this testimony is credible.  It cannot be disputed that Season-All used laborers, material

suppliers, and subcontractors to perform extensive work on the Plaintiffs' project.  Season-All paid for

(among other things) the lumber and decking, the cement and its delivery with special pumping

equipment, plumbing (but not plumbing fixtures), a deposit on another plumber whose services were

lost because the project was delayed, installation of the HVAC system, the siding, roofing, doors, and

windows, repointing of the chimney, electrical work for the garage, and labor for workers employed by

Season-All (not including Alexander himself).  The scope of the labor, materials, and services provided

and of the work Season-All completed is consistent with the figure of $105,000.  Any laborer,

subcontractor, or supplier that was not paid for the work or materials it contributed to this project could

be counted on to seek payment by a small claims action or a mechanic's or materialman's liens, and the

Plaintiffs were able to point to only one subcontractor—for the garage door—that surfaced in this

manner.  I conclude that Season-All paid approximately $105,000 for labor, materials, and subcontracts

for the Plaintiffs' project.

29.    In addition, Season-All incurred "soft costs" for the Plaintiffs' project in the form of its

overhead, which Alexander referred to as the corporation's "burden."  Season-All operated under a

burden of 26 percent—meaning 26 percent of the hard costs—a percentage the Plaintiffs did not

dispute.  A 26 percent burden on hard costs of $105,000 amounts to $27,300.

30.    The total payments under the CAs were also designed to pay Season-All a profit of

another 8 percent of the hard costs, or profit of $8,400 on hard costs of $105,000.  This is not to say that

Season-All made a profit of $8,400 on these CAs.  It incurred unbudgeted or unanticipated costs that it

had to and did absorb, such as check-cashing fees of $2800, that are not reflected in the total of monies

paid out for this project.

31.    In view of these figures, Season-All provided at least $140,700 of value [$105,000 plus

$27,300 plus $8,400] for the payments it received on the contract, which were no more than $148,330.

32.    The Plaintiffs have requested a finding that "[i]n five months, Alexander issued checks

payable to cash, for his personal benefit and to Angelini nearly [sic] $60,000."  This request is unclear,

but I construe it to seek a determination that, during an unspecified five-month period, Alexander issued

checks totaling $60,000 from Season-All's bank account to himself and to Angelini and that the checks to

himself were for his personal benefit.  For this proposed finding, the Plaintiffs have cited, without detail,

two large exhibits, consisting together of approximately 150 pages of the records of two bank accounts.

They neither cite nor discuss testimony relevant to these exhibits and the finding.  They inappropriately

leave to the court the task of determining what in the voluminous exhibits is relevant to their proposed

finding.[13]

---

[13] The Plaintiffs' proposed findings are, at almost every turn, devoid of the detailed accounting work and item-by-item analysis that a case like theirs requires.

33.    The evidence shows that from April through December, 2006, Alexander wrote only the

following checks against the Season-All account to Angelini:

     a.   Check No. 1026 on July 9 for $5000;
     b.   Check No. 1031 on July 14 for $4000;
     c.   Check No. 1088 on October 19 for $7500;
     d.   Check No. 1110 on November 7 for $2500;
     e.   Check No. 1127 on November 22 for $2200;
     f.   Check No. 1136 on December 4 for $4000; and
     g.   Check No. 1145 on December 11 for $2500. [14]

34.    With one exception, each of the above payments to Angelini was either a subchapter S

corporation distribution or reimbursement for Season-All's share of the mortgage and utility costs.  The

exception was Check No. 1031, which was reimbursement from the corporation for monies Angelini had

paid to a Mr. Selig in satisfaction of a corporate obligation.  In view of the timing of payments from the

Plaintiffs and Season-All's cash flow problems, it is clear that, among the above-enumerated transfers to

Angelini, only the two July payments could have been funded even in part with monies paid to Season-

All by the Plaintiffs.

35.    The evidence shows that from April through December, 2006, Alexander wrote the

following checks against the Season-All account to cash or to himself:

     a.   Check No. 991 on May 26 for $5,000 (memo: payroll account");
     b.   Check No. 1006 on June 2 for $4000;
     c.   Check No. 1015 on June 7 for $2000;
     d.   Check No. 1018 on June 9 for $4000;
     e.   Check No. 1025 on June 14 for $2518;
     f.   Check No. 1032 on July 12 for $6000 (memo: "for payroll");
     g.   Check No. 1034 on July 21 for $2500;
     h.   Check No. 1038 on August 11 for $3005;
     i.   Check No. 1063 on September 16 for $4000;
     j.   Check No. 1103 on October 27 for $500;
     k.   Check No. 1130 on November 25 for $200;
     l.   Check No. 1150 on December 9 for $500;
     m.   Check No. 1155 on December 18 for $600.

---

[14] The date on this check is June 8, 2006, but it cleared the account on December 22, 2006.  From its check number and date of clearance, I conclude that this check was simply misdated.

36.     Alexander testified credibly that, of the checks listed in the preceding paragraph, No. 991 and No. 1032, for $5000 and $6000 respectively, were used to pay the wages of Season-All's laborers.

37.     The records of the Season-All checking account show that between August and December 2006, Season-All received significant income from at least two other construction projects, much more than it received during this period from the Plaintiffs.

38.     The Plaintiffs have made no attempt to demonstrate, on a payment by payment basis, when the payment was due and what discussions occurred in advance of the payment that determined the timing and amount of the payment.  Except as to the payment of $8,340 on August 8, the Plaintiffs have requested no finding of fact that Alexander made a specific misrepresentation in conjunction with a particular payment.  Except with respect to the August 8 payment, the voluminous record contains very little evidence at all as to conversations and representations, if any, that preceded each payment. The evidence does not permit the court to find that Alexander made a misrepresentation in conjunction with any specific payment other than that of August 8.

39.     The Plaintiffs made the payment of August 8, 2006 in the amount of $8,340.00 for the specific purpose of funding Alexander's purchase of certain kitchen cabinets.  Cader testified that Alexander had told her that he had placed an order for the cabinets, that he had needed to pay for the cabinets as a condition of placing the order, and that he needed payment from the Plaintiffs in the amount of $8,340 as reimbursement for the amount he had advanced for the cabinets.  Alexander testified that he told Cader not that he had placed an order for the cabinets but that he could not order them without first paying for them and therefore that he needed payment from the Plaintiffs in advance.  He concedes that he never placed an order for the cabinets and that he had misrepresented to Cader that he would use her payment for that purpose.  He further concedes that he did not use this payment or any other payment to purchase the cabinets.  He maintains that he used these funds for

other purposes—partly to pay for labor on this project and partly to hire an attorney; the evidence neither proves nor disproves this statement. Still, it is clear that Alexander made his misrepresentation to Cader with knowledge of its falsity and to induce the Plaintiffs to make the payment in question. They did rely on it, justifiably, to their detriment by making a payment that they would not otherwise have made or been obligated to make, without receiving cabinets in exchange.

40.     The Plaintiffs have requested a further finding that "Alexander stated that he accepted a check in September when he knew he had no intention of continuing the Renovation Project." The Plaintiffs supply no citation to the transcript or other evidence for this proposed finding. I find that Alexander (for Season-All) did accept the September payment of $5,700, and that he knew at the time that his relationship with the Plaintiffs was at or near a crisis point, but not that he had no intention of continuing the project. In any event, there is no evidence—or even allegation—that he made a false statement in conjunction with this payment or accepted it under a false pretense.

41.     In January, 2007, the Plaintiffs filed suit in the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts against Season-All, Alexander, Angelini, the check-cashing facility that Alexander had used, and others. As against Alexander and Angelini, the complaint sought damages for, among other things, (i) breach of the Plaintiffs' contracts with Season-All, for damages of $135,000; (ii) conversion of the $93,481 proceeds of checks cashed at the check-cashing facility, (iii) unfair trade practices under MASS. GEN. LAWS ch.93A, § 9, and (iv) violation of MASS. GEN. LAWS ch. 142A (Regulation of Home Improvement Contractors). The breach of contract count relied on a theory that there was cause to pierce the corporate veil and hold Alexander and Angelini liable as if they were parties to one or both of the CAs. As against Alexander alone (not also Angelini), the complaint also included counts for (v) "Intentional Misrepresentation/Fraud/Deceit" and (vi) "Negligent Misrepresentation/Negligence." As an attachment to the complaint, the Plaintiffs filed an affidavit by a Kenneth McGrath, a construction supervisor, who opined that the cost to the Plaintiffs of completing

the work left undone by Season-All, and of correcting work that Season-All did incorrectly, would total $135,000.

42.     Neither Alexander nor Angelini answered or otherwise defended the Superior Court complaint.  The Plaintiffs moved for entry of default judgment.  On August 1, 2007, the Superior Court entered default judgment against Alexander and Angelini, jointly and severally, in the principal amount of $135,000, with interest from April 1, 2006 in the amount of $21,614.98, plus attorney's fees of $6,500 and the costs of that action.  The costs were quantified in a subsequently issued execution at $430.30.

**RULINGS OF LAW**

The relief requested in this adversary proceeding falls into five groupings that I will address in turn:

i.      Plaintiffs' requests to determine that Alexander's judgment debt is excepted from discharge because Alexander induced the Plaintiffs to enter into their contract with Season-All by Alexander's false pretense as to Season-All's solvency;

ii.     Plaintiffs' request to determine that some or all of Alexander's judgment debt is excepted from discharge by virtue of fraudulent misrepresentations by Alexander as to the use to which he would or did put their payments;

iii.    Plaintiffs' request to determine that some or all of Angelini's judgment debt is excepted from discharge by virtue of her knowledge of and benefit from the false pretenses and misrepresentations that are the subject of (i) and (ii);

iv.     Alexander's counterclaim for breach of contract; and

v.      Alexander's counterclaim for orders of referral to various investigative authorities.

### i.        False Pretense and False Representation of Solvency

The Plaintiffs first seek a determination that Alexander's judgment debt is excepted from discharge by 11 U.S.C. § 523(a)(2)(A) because Alexander induced the Plaintiffs to enter into their contract with Season-All by false pretense as to Season-All's solvency.  Plaintiffs' counsel explained at the start of trial that the Plaintiffs were relying here not on a false representation, either spoken or written, but on a false pretense—that is, conduct leading to a false impression—and the false impression created was that Alexander and the corporation were solvent.  The Plaintiffs contend that Alexander fraudulently created this false impression by his appearance and pattern of conduct, including, to the extent that these were specified before trial, that he "showed up on Harley Davidsons." In their posttrial Proposed Findings and Conclusions, they seek a finding in support of this count to the effect that "[t]he Plaintiffs observed that Alexander appeared financially successful inasmuch as he drove a very nice car, appeared well dressed, and spoke very well. Alexander would also occasionally drive his expensive motorcycle to the Property."

After trial, departing from the theory on which the case had been tried, the Plaintiffs requested a further finding that Alexander also made an express or implied representation about solvency:  "that he and his company were financial [sic] solvent, having sufficient staff and financial resources to timely and competently complete the renovation project on Plaintiffs' property."  The evidence they cite in support of this proposed finding is uniformly oral representations.  They do not contend that Alexander made a statement to them in writing concerning his financial condition, much less that he gave them a balance sheet or income statement or the like.

Alexander argues, in essence, that this count fails to state a claim on which relief can be granted because a fraudulent pretense or representation concerning a debtor's financial condition is not actionable under § 523(a)(2)(A).  Rather it is actionable only under § 523(a)(2)(B), which expressly

requires, as a condition of nondischargeability, that the statement have been in writing, and there was

no writing here.  The Plaintiffs have offered no argument or authority on the issue.

The Court agrees with Alexander.  A statement concerning the solvency of Alexander or of

Season-All, an "insider" of Alexander,[15] is a "statement . . . respecting the debtor's or an insider's

financial condition" within the meaning of § 523(a)(2)(B).[16]  Within § 523(a)(2), subsection (a)(2)(B)

governs the special case of statements respecting the debtor's or an insider's financial condition.  It

therefore takes those statements out of the governance of § 523(a)(2)(A)[17] and requires, as a condition

of a debt's exception from discharge, that the debt have arisen from a statement "in writing."[18]  The

Plaintiffs have neither alleged nor adduced evidence of a statement in writing.  The Court must

therefore dismiss those of their demands for relief that are based on false representations and false

pretenses as to solvency.

---

[15] Alexander was an officer and person in control of Season-All.  Season-All was therefore an insider of Alexander. 11 U.S.C. § 101(31)(A)(iv) (in the Bankruptcy Code, "insider" includes, if the debtor is an individual, "corporation of which the debtor is a director, officer, or person in control").

[16]  There is disagreement among the courts about the breadth of the term "statement respecting financial condition," but even courts that construe the term narrowly agree that it at least encompasses a statement regarding overall solvency.  *In re Kosinski*, 424 B.R. 599, 609-610 (BAP 1st Cir. 2010) (collecting cases on each side of the controversy and holding that a "statement of financial condition" for purposes of paragraph (a)(2)(B) denotes a representation of an entity's overall net worth, overall financial health, income flow, or ability to generate income); *In re Joelson*, 427 F.3d 700, 714 (10th Cir. 2005) (Statements respecting the debtor's or an insider's financial condition "are those that purport to present a picture of the debtor's overall financial health." "[S]uch statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement.  What is important is not the formality of the statement, but the information contained within it—information as to the debtor's or insider's overall net worth or overall income flow.").

[17]*Rose v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004) ("Subsections 523(a)(2)(A) and (B) are mutually exclusive.");  *Middlesex Savings Bank v. Flaherty (In re Flaherty)*, 335 B.R. 481, 490 (Bankr. D. Mass.  2005) ("The exception to discharge under § 523(a)(2)(A) does not deal with deception by means of a statement relating to the debtor's or an insider's financial condition, which is the subject of section 523(a)(2)(B).").

[18] 11 U.S.C. § 523(a)(2)(B).

ii.     **False Representations as to Use of Payments**

The second set of misrepresentations as to which the Plaintiffs are proceeding under §

523(a)(2)(A) are representations as to how the monies they paid were used or would be used.  As

detailed above in the Procedural History, the complaint fails to plead with specificity the representations

in issue.  When asked at trial to clarify the factual bases of their § 523(a)(2)(A) claims, Plaintiffs' counsel

offered only the following:

> [Alexander] represented that he would use their money to purchase
> materials for their projects and do the work as set forth in the contract.
> That didn't happen. There were materials that he represented had been
> purchased, but they hadn't been.[19]

During the trial, evidence was adduced as to only one misrepresentation by Alexander as to the use to

which a particular payment would be put:  the $8,340 payment of August 8, which Alexander falsely

represented to Cader would be used to pay for kitchen cabinets.  Alexander clearly understood that this

particular representation was a basis of the complaint against him.  As to any other alleged

misrepresentation, however, neither the defendants nor the court can be deemed to have had fair

notice.

Among the debts excepted from discharge in 11 U.S.C. § 523(a) is any debt "for money,

property, services . . . to the extent obtained, by . . . false pretenses, a false representation, or actual

fraud."  11 U.S.C. § 523(a)(2)(A).  As with all § 523(a) exceptions to discharge, the exception listed in §

523(a)(2)(A) is "narrowly construed in furtherance of the Bankruptcy Code's 'fresh start' policy."

*Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Century 21 Balfour Real Estate v.*

*Menna*, 16 F.3d 7, 9 (1st Cir. 1994)) (internal quotation marks omitted).  Creditors invoking 11 U.S.C. §

523(a)(2)(A) must prove each element of the exception by a preponderance of the evidence.  *Palmacci*,

212 F.3d at 787 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1995)).  Specifically, the Plaintiffs must show

by a preponderance as to each count asserted that:  (1) the debtor made a false representation; (2) he

---

[19] Transcript, Day 1, pp. 22.

did so knowingly or with reckless disregard of the truth; (3) he made the misrepresentation with intent

to deceive them and to induce them to rely upon it; (4) they did rely upon it; (5) their reliance was

justifiable; and (6) their reliance caused pecuniary loss. *Palmacci*, 121 F.3d at 786; *In re Burgess*, 955

F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or justifiability of reliance).

The Plaintiffs have proven that Alexander's representation to Cader that the $8,340 payment of

August 8 would be used to pay for kitchen cabinets satisfies each of these requirements.  Alexander

made the representation with the intent of inducing the Plaintiffs to make the payment.  He knew he

would not use that payment for the stated purpose[20] and intended at the time to use it for other

purposes.  They justifiably relied on his representation.  And they were injured by it to the extent of the

monies advanced, plus the portion of judgment interest, costs, and attorney's fees attributable to it.

The principal amount of the judgment, $135,000, was based on the estimated cost to the Plaintiffs of

completing the project.  No evidence has been adduced that the unpurchased cabinets figured into this

total other than on a dollar-for-dollar basis:  Alexander's misrepresentation meant that it would cost the

Plaintiff's $8,340 more to complete the project than it would otherwise have cost them.  The cost of the

cabinets was 6.1777 percent of the total principal amount of the judgment.  Accordingly, of the interest

($21,614.98), attorney's fees ($6,500.00), and costs ($430.00) quantified in the judgment, 6.1777

percent is likewise excepted from discharge, a total of $1,764.06.  In addition, postjudgment interest on

$8,340.00 at the state postjudgment interest rate is excepted from discharge.

To the extent that the Plaintiffs seek a determination that any other payment was made in

reliance upon a false representation, judgment must enter for Alexander for each of four reasons.  First,

as detailed above, the complaint failed to plead any other misrepresentation with particularity and

therefore to put Alexander (and Angelini, to the extent the complaint seeks to charge her for

Alexander's actions) on notice of the fraud allegations against which they had to defend.  Second, the

---

[20] I do not find, and need not find, that he did not intend ever to purchase the cabinets, only that he did not intend
to use these funds for that purpose.

Plaintiffs have adduced no evidence of any misrepresentation that was made in conjunction with any particular payment other than the payment for the cabinets.

Third, the Plaintiffs have adduced no credible evidence that Alexander promised them that Season-All would use their payments only for contractual purposes.  The CAs themselves contain no such language.  The CAs simply obligated Season-All to get the job done, regardless of how much it cost to do it (less or more than the contract price) and what funds the company used to do it with.   It might be possible to construe the CAs as requiring, as a condition of certain payments after the initial payments, that the payments be limited to amounts expended on the contract plus a contractors' premium.[21]  This would in turn require that, on a payment by payment basis, Season-All would, before asking for payment in a certain amount, make an accounting as to amounts that had been expended, to justify the amount of the payment.  But this is not a requirement that the contract funds be used on the contract, only that payments correspond to work done.[22]

Fourth, to the extent that the Plaintiffs rely on a generalized allegation that the very contract was in its entirety a fraud, intended by Alexander to produce a stream of payments in exchange for which he would provide little or no value, the allegation is unproven and grossly inconsistent with the evidence.  The evidence suggests that Alexander entered into the CAs with the intent to perform, as is evidenced by the fact that Season-All did in fact perform extensive work on the project and paid for most of the labor, materials, and subcontractors he employed to do the work.  The causes of its cash flow problem are unclear, but several factors appear to have played a role:  that Season-All came into to the project with preexisting solvency issues, especially tax obligations that it apparently lacked the funds at that time to pay; that Season-All likely underbid this contract in order to get the work, meaning that

---

[21] I do not hold that the contract *should* be so construed.  The CAs contain other language according to which payments would be made in predetermined amounts upon the reaching of certain milestones.  I see no obvious means of reconciling the two contractually specified means of determining the timing and amounts of payments.
[22] Moreover, no evidence has been presented that Alexander made misrepresentations of the work completed in conjunction with any particular payment.  The complaint pleads no such misrepresentation with particularity.

the contract left little or no room for error; and that licensing delays, the rain damage, and a few other items that Alexander had not anticipated caused expenses to increase over budget and payments to slow.  I cannot determine from the record precisely the extent to which any one of these was a factor. The important point is that they are collectively a much more plausible explanation for the course of the project than that Alexander entered into it with an intent to defraud.  For these reasons, Alexander's judgment debt is excepted from discharge only to the extent of the portion attributable to the cabinet payment; the balance is discharged.


     **iii.**    **Angelini**

The Plaintiffs contend that their judgment against Angelini should be excepted from discharge because it arises from "actual fraud" within the meaning of § 523(a)(2)(A), as defined in *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000).  The complaint specifies her actual fraud as follows:  "[she], both individually and as an officer of the Corporation [Season-All], aided and abetted Alexander in his fraudulent activities."  Plaintiffs' counsel indicated that the evidence of actual fraud would consist of proof that Angelini  (i) was treasurer and a 51 percent shareholder of the corporation, (ii) handled "the money," (iii) benefited from Alexander's defrauding of the Plaintiffs, and (iv) knew what was going on.

In *McClellan v. Cantrell*, the Seventh Circuit Court of Appeals endorsed a broad definition of "actual fraud":

> "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quoting from *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (Okla. 1952)).  Even by this broad definition, no fraud has been proven against

Angelini.  Insofar as the Plaintiffs do not charge Angelini with responsibility for any fraud beyond the

bounds of the fraudulent activity that they have proven against Alexander, the Court need only

determine whether she can fairly be charged as complicit in the misrepresentation concerning the

cabinet payment, the only fraudulent conduct proven against Alexander.  The Plaintiffs have failed to

prove any such complicity by a preponderance of the evidence.  The evidence shows that Angelini was

not privy to the details of this project, had no active role in the corporation or this project during the

duration of the project, did not handle corporate funds and payments during this period, and did not

"know what was going on."  The Plaintiffs have not shown that she had specific knowledge of or

involvement with the cabinet payment; and the evidence shows that this payment was not used to fund

a payment from Season-All to her.  The complaint against Angelini must therefore be dismissed.  Her

judgment debt is not excepted from discharge.

### iv.        Counterclaim for Breach of Contract

By his first counterclaim, Alexander seeks damages against the Plaintiffs for breach of the

construction contract between Season-All and the Plaintiffs.  The Court will dismiss this count without

prejudice for the following reasons.

First, whatever cause of action Alexander may have against the Plaintiffs for breach of contract,

including this counterclaim (if it is valid), became an asset of his bankruptcy estate at the time of his

bankruptcy filing.[23]   A review of the case docket indicates that the chapter 7 trustee has not abandoned

estate property, and Alexander has not claimed this cause of action as exempt.  Therefore, the cause of

action remains property of the estate, and authority to prosecute or otherwise administer it resides in

---

[23] 11 U.S.C. § 541(a)(1) (the commencement of a bankruptcy case creates an estate comprised of, among other things and subject to certain exceptions not relevant here, "all legal or equitable interests of the debtor in property as of the commencement of the case").  The relevant events with respect to the parties' contract claims against each other occurred and were completed long before the filing of the bankruptcy petition.

the chapter 7 trustee.[24]  Unless and until the trustee abandons it to him, Alexander lacks standing to

prosecute this counterclaim.

Second, even if this counterclaim were Alexander's to prosecute, resolution of the counterclaim

would have no effect on this bankruptcy case, and therefore the counterclaim would fall outside the

court's subject-matter jurisdiction.  In order for a proceeding to fall within the jurisdiction that a

bankruptcy court has authority to exercise, a proceeding must at least "relate to" a bankruptcy case.  28

U.S.C. § 1334(b) and 157(a).  The limit of "related to" jurisdiction is defined by the well-accepted *Pacor*

test:  a proceeding is "related to" a bankruptcy case if "the outcome [of the proceeding in question]

could conceivably have any effect on the estate being administered in bankruptcy."[25]  A proceeding can

sufficiently affect the estate by "altering debtor's rights, liabilities, options, or freedom of action, or

otherwise hav[ing] an impact upon the handling and administration of the . . . estate."[26]  The present

counterclaim is a two-party dispute that arises wholly under state law, not the Bankruptcy Code, and

that would affect neither the estate nor Alexander's rights to bankruptcy relief.  It is not related to this

bankruptcy case, and this court would therefore lack jurisdiction over it.

For these two reasons, lack of standing and of relation to the case, the court lacks subject-

matter jurisdiction over the counterclaim, and the counterclaim must therefore be dismissed.

---

[24] 11 U.S.C. § 323(a) ("The trustee in a case under this title is the representative of the estate."); 11 U.S.C. §
704(a)(1) ("The trustee shall collect and reduce to money the property of the estate for which such trustee
serves[.]").

[25] *Pacor v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984).  See also *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991)
(endorsing the *Pacor* test).

[26] *In re Boston Regional Medical Center, Inc.*, 410 F.3d 100, 105 (1st Cir. 2005).

**v.**     **Counterclaim for Orders of Referral**

By his second counterclaim, Alexander seeks orders referring both Plaintiffs to appropriate

authorities for investigation of wrongs they are alleged to have committed in the course of his dealing

with them.  Except with respect to certain breaches of duty that may occur in my presence, especially by

attorneys, I am aware of no authority for this court to serve that function.  None of the complained-of

conduct occurred in my presence.  Moreover, those referrals would have no "relation to" this case

within the meaning of the *Pacor* test and therefore, for the same reason as articulated with respect to

the other counterclaim, would fall outside this court's subject-matter jurisdiction.  I therefore will

dismiss this counterclaim, too, for lack of subject-matter jurisdiction.


**CONCLUSION**

For the reasons set forth above, the court will enter judgment declaring that the judgment debt

of Alexander to the Plaintiffs is excepted from discharge to the extent of, and only to the extent of,

$10,104.06, plus interest on $8,340.00 at the state judgment rate from the date of the state judgment;

that the balance of Alexander's judgment debt and the entirety of Angelini's judgment debt is

discharged; and that the counterclaims are dismissed.


Date:  July 23, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge